Filed 7/15/15  P. v. Leon CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B256643 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA408441) |
| v. | |
| MOSES LEON, | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County.  Craig Richman, Judge.  Affirmed.

Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Stephanie A. Miyoshi and Tita Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant Moses Leon, and his codefendant Ezra Robert Alvarenga (who is not a party to this appeal) were charged with first degree residential burglary (Pen. Code, § 459)[1] with gang enhancement allegations (§ 186.22, subd. (b)(1)(A)).  It was also alleged that defendant had suffered two prior convictions.  (§§ 667.5, subd. (b), 1170, subd. (h)(3).)  The trial court denied defendant's motion to bifurcate trial of the gang enhancement.  Ultimately, the trial court dismissed the gang allegations, because the People failed to prove the predicate gang offenses.  Defendant was convicted of burglary, and admitted his prior convictions.  The codefendant was acquitted.

The primary evidence of the burglary was a surveillance video capturing the crime.  On appeal, defendant contends the trial court erred by:  (1) denying his motion to bifurcate trial on the gang enhancement; (2) allowing the prosecutor to introduce evidence which was not timely disclosed to defendant, and denying defendant's request to instruct the jury with CALCRIM No. 306 concerning the untimely disclosure of evidence; (3) allowing police officers to testify that defendant was depicted in the surveillance video capturing the burglary; and (4) failing to answer the jury's question about whether the officers' lay opinions constituted direct or circumstantial evidence.  We affirm.

## BACKGROUND

### I.    Discovery and Evidentiary Issues

On February 18, 2014, the case was sent out for trial.  The case had been assigned to the prosecutor a week earlier.  On February 19, while jury selection was underway, codefendant's counsel told the court that the prosecutor had just turned over booking photographs of the defendants that she intended to use at trial.  Codefendant's counsel objected on relevance grounds.  The prosecutor stated that she had just been assigned to the case, and did not realize the relevance of the booking photographs until she observed defendant in court, and discovered that his appearance had changed dramatically from the

---

[1]    All further references are to the Penal Code, unless otherwise indicated.

2

time of his arrest. Codefendant's appearance had also changed. Defendant's counsel joined in the objection. The court reserved decision on the issue, after the prosecutor represented that she did not intend to mention the photographs in her opening statement.

The prosecutor stated she intended to have several police officers identify the defendants in the surveillance video capturing the burglary. Because the prosecutor did not intend to mention this evidence during her opening statement, the trial court reserved decision on the admissibility of this testimony until later in the proceedings. The next day, the trial court asked the parties to be prepared to discuss four cases concerning lay testimony identifying individuals in videos, including *People v. Perry* (1976) 60 Cal.App.3d 608 (*Perry*), *People v. Mixon* (1982) 129 Cal.App.3d 118 (*Mixon*), *People v. Ingle* (1986) 178 Cal.App.3d 505 (*Ingle*), and *People v. Larkins* (2011) 199 Cal.App.4th 1059.

Also the next day, defendant's counsel informed the court that she had just received a packet of photographs from the prosecutor. Some were taken on the day of defendant's arrest, and showed his tattoos. Counsel moved to exclude the photographs on the ground they had not been disclosed within 30 days before trial. The prosecutor told the court that she had only received the photographs the night before, and they were "highly relevant" to the issue of defendant's gang membership. The court reminded counsel it could order defendant to remove his clothes before the jury to display his tattoos, and that the photographs were a less invasive means of introducing this evidence. Because the evidence would not be introduced that day, the court stated its view that defense counsel would have ample time to review the photographs, and the parties could address later whether the photographs were gang related and therefore relevant. Two days later, the prosecutor turned over three more photographs of defendant's tattoos that she had just received from one of the investigating officers.

On February 21, when the parties resumed discussion of the video identification issue, the prosecutor stated she intended to call Officers Matthew Zeigler, Garrett Breegle, Justin Howarth, and Rafael Lopez to testify to the identity of the individuals in the video. She represented that all four officers were familiar with the defendants before

3

they committed the charged burglary.  Officer Zeigler had known defendant for eight years, and had "countless" "formal and informal" contacts with him.  Officer Howarth had informal contacts with both defendants.  Officer Breegle, who the prosecutor indicated would testify as her gang expert, had numerous contacts with both defendants.  Officer Lopez had collected defendant's shoes and booked them into evidence at the time of his arrest, after recognizing them as the shoes defendant was wearing in the video.

Officer Zeigler had testified at the preliminary hearing to his prior contacts with both defendants, and neither defendant disputed his familiarity with them.  Officers Breegle and Howarth were listed on Field Interview cards concerning defendant, and were identified on the prosecution's witness list.  Defense counsel said she was unaware that Officers Breegle and Howarth had viewed the surveillance video, and believed Officer Lopez's only contact with defendant was on the day of his arrest.  Counsel argued she expected that Officer Landry (who had testified at the preliminary hearing) was going to testify as the gang expert, not Officer Breegle.  Counsel had no curriculum vitae or witness statements from Officer Breegle.  Counsel asked the court to exclude his testimony as an expert.

The prosecutor stated that she did not have a curriculum vitae for Officer Breegle, and there were no witness statements from Officers Howarth, Breegle or Lopez.  The prosecutor had done a *Brady*[2] check and there was no *Brady* information for any of the officers.  She did not know why Officer Landry was no longer available to testify as a gang expert.

Counsel requested an Evidence Code section 402 hearing (section 402 hearing) to decide the admissibility of the four officers' testimony.  Based on the prosecutor's representations and without any testimony on the subject, the trial court concluded that Officer Lopez lacked sufficient familiarity to testify to defendant's identity in the video, as his only encounter with defendant was on the day of his arrest.

---

**2**      *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

4

Codefendant's counsel objected that three officers testifying to the contents of the video would be cumulative, and the trial court agreed. The court ordered the prosecutor not to discuss the officers recognizing the defendants on the video until after an evidentiary hearing was held.

Codefendant's counsel also objected that she had seen, in the prosecutor's evidence folder, a number of still photographs taken from the video. Neither defendant had received copies of the still photographs from the prosecutor, although they each had copies of the video. The prosecutor stated, "I had no idea since both counsel have the video that they would want copies of every single still. They did inform me that they wanted copies. I agreed to make copies." The court found there had been no discovery violation since defense counsel had the video from which the stills were taken and would soon receive copies of the stills.

The trial court held the section 402 hearing on February 24, 2014, concerning Officer Breegle testifying as a gang expert, and Officers Zeigler, Breegle and Howarth testifying to the identity of the people depicted in the surveillance video. At the outset of the hearing, defendant's counsel objected to the testimony of Officers Howarth and Breegle on the basis that she never received any witness statements from them, and the only notice she received that these witnesses had any contact with defendant was on Field Interview cards turned over to the defense. In response to a question from the court, the prosecutor stated she intended to prove that Officers Zeigler, Breegle, and Howarth had numerous undocumented contacts with defendants.

When the court queried the prosecutor about how defense counsel were to prepare for testimony about these undocumented contacts, the prosecutor pointed out that Officer Zeigler had testified to undocumented contacts at the preliminary hearing. Also, the gang expert at the preliminary hearing (Officer Landry) had testified that he based his opinion on other officers' contacts with defendants. The prosecutor offered defense counsel an opportunity to question the officers, outside the presence of the jury, about the undocumented contacts.

5

The court then received the testimony of Officer Breegle. Officer Breegle testified that he had three or four contacts with the codefendant over the last couple of years. The contacts occurred in 2012, in the Northwest area of the Rampart division, which is near the address where the burglary occurred. On each occasion, Officer Breegle spoke with the codefendant for five or seven minutes, and had an opportunity to observe his physical appearance. Most of the encounters were consensual. Officer Howarth was Officer Breegle's partner, and was present for at least one of these stops.

Officer Breegle also was familiar with defendant. He had a number of encounters with defendant between 2010 and defendant's arrest in this case in 2013. Officer Breegle had contact with defendant at least 10 times; of those, approximately eight were undocumented. The majority of the encounters were consensual, and included Officer Howarth. Officer Breegle also performed parole compliance checks on defendant. These encounters generally occurred in the Northwest area of the Rampart division. Each of the encounters lasted five to seven minutes. Over the course of these encounters, Officer Breegle became familiar with defendant's physical appearance.

At this point, the court resumed trial, ordering that the defense could recall Officer Breegle for a further section 402 hearing to resolve any outstanding issues as to his proffered testimony.

During trial, Officer Zeigler testified to the identities of the individuals in the video. Officer Zeigler testified that he recognized both defendant and the codefendant when he watched the surveillance video. There were two other individuals he did not recognize in the video. When the video was played for the jury, and the prosecutor identified a frame and asked "that's who you're identifying as [codefendant]?" Officer Zeigler responded, "No . . . that's [defendant] Leon." Defendant objected that the question "calls for ultimate conclusion" and the objection was overruled. The court told the jury, "Ladies and gentlemen, it's for you to decide who is in this video." Officer Zeigler identified codefendant and defendant in the video.

Outside the presence of the jury, codefendant's counsel objected to Officer Ziegler testifying that codefendant was depicted in the video rather than that it was his opinion

6

that codefendant was depicted in the video. The court agreed, and stated that counsel should clarify that point on cross-examination. Defendant joined in the objection. The court explained that it had instructed the jury that it was for them to ultimately decide who was depicted in the video, and that counsel could clarify on cross-examination that Officer Zeigler was merely stating his opinion. Both counsel agreed this was a proper approach.

With the jury present, Officer Zeigler was asked the identity of the person wearing a Lakers hat in a still photograph taken from the video, and Officer Zeigler opined it was defendant. Defendant's counsel objected that the question sought improper lay opinion. The court overruled the objection and again informed the jury that it was their duty to decide who was depicted in the photograph.

At the conclusion of Officer Zeigler's testimony, outside the presence of the jury, the trial court stated its view that allowing Officer Howarth to identify the defendants in the video would be cumulative. The court then found defense counsel had adequate notice that Officers Breegle and Howarth would testify to undocumented contacts with the defendants. The court observed that "based upon the fact that these contacts were undocumented, . . . you certainly can make a lot of hay with undocumented contacts without much preparation time . . . ."

Later that day outside the presence of the jury, the trial court resumed the section 402 hearing concerning Officer Breegle's proffered testimony, and asked the attorneys whether any additional testimony was required from him. Defendant's counsel stated she did not need anything further from him. Codefendant's counsel asked the prosecutor for an offer of proof about the basis for Officer Breegle's opinion that her client was a gang associate, and why the crime was committed for the benefit of the gang. Officer Breegle testified that his opinion was based on other officers' contacts with codefendant in gang territory, and his prior drug dealing arrest on gang turf. Moreover, codefendant had been arrested for weapon possession, and had been associating with known gang members. The court concluded that neither offense should be mentioned as a basis for Officer Breegle's opinion, but that he could rely on codefendant's association with other gang

7

members. Officer Breegle responded that he did not intend to discuss defendant's prior convictions as a basis for his opinion about defendant's gang membership or as predicate offenses of the gang. Defendant's counsel did not ask Officer Breegle any questions about his opinion as to defendant's gang membership.

Defendant's counsel again complained that she did not have adequate notice that Officer Breegle would be testifying as a gang expert. The court pointed out that counsel was on notice that a gang expert would testify. Counsel argued that she could have filed a *Pitchess*[3] motion as to Officer Breegle, but the court pointed out that there was no basis to do so, as he was not involved in defendant's arrest. The court stated that it believed defendant would not be prejudiced by Officer Breegle's testimony because it "would not be significantly different than Officer Landry should he have testified."

The court then asked if a continuance was necessary so that counsel could prepare to cross-examine Officer Breegle. Counsel declined the continuance, and asked that the court instruct the jury about untimely discovery rather than continue the case. The trial court explained that there was no late discovery, rather, a different expert was going to testify. The court pointed out that counsel could leverage differences in Officer Landry's opinion from Officer Breegle's opinion to the jury. The court also told counsel, "I will delay this trial however long is necessary to get Officer Landry in here, if necessary, to testify to any inconsistencies." The court asked whether counsel's concerns were resolved, and counsel stated, "If that's what the court is going to rule, then I'm going to submit."

The court also stated it would permit Officer Breegle to testify to undocumented contacts with the defendants and to defendants' depiction in the video. The court admonished the prosecutor not to spend "nearly as much time . . . on the videotape as was spent with Officer Zeigler." The court stated it would permit Officer Breegle to testify

---

[3] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

primarily as an expert, but he could briefly testify that he recognized defendants in the video. The court told the prosecutor not to play the video again to the jury but to use a couple of still photos from the video to question Officer Breegle. The court also explained that it would again tell the jury that Officer Breegle's opinion about the identity of the defendants in the video was lay opinion, and not an expert opinion.

## II. Evidence Adduced at Trial

Defendant does not claim a lack of substantial evidence so we do not summarize all of the trial testimony. Gisela N. testified that on February 27, 2013, she lived in an apartment located at the 500 block of North Kenmore Avenue in Los Angeles. She owned a Honda Accord that she parked in the complex's attached subterranean garage. Gisela's husband, Daniel L., also drove the car. On February 27, Gisela reported to police that someone had broken into her car while it was parked in the apartment's garage. Approximately $5 in change was taken from the car. The car's windows were not broken.

Daniel L. testified that he lived in an apartment with his wife at the 500 block of North Kenmore. He was the primary driver of the couple's Honda Accord. When not driving the car, Daniel parked it in the complex's garage. Around 7:00 or 8:00 on the evening of February 26, Daniel parked the car in the garage after returning from work. He locked the car's doors. On the morning of February 27, as he was leaving for work, Daniel noticed that the driver's door was unlocked. Papers were strewn about the vehicle, and the change compartment "was like broken off." All the change from the compartment was missing. Daniel told the building manager, Edgar E., about the break in. Gisela made a police report later that day, after Edgar advised Daniel to call police.

Edgar E. was the onsite manager for the apartment complex. There are two stairwells that provide access from the garage to the building, and the doors between these stairwells and the building are not locked. There are two vehicle entry doors into the garage, which are kept closed and locked. Residents are provided with remote controls to access the garage, and remotes are not supplied to people who did not live in the building. There are also two locked pedestrian gates to access the garage that require

9

a key. Keys are not provided to nonresidents. At the time of the burglary, neither defendant was a tenant of the building.

On February 27, 2013, there was a video surveillance system that recorded various views of the garage. Gisela reported that her car had been broken into. Edgar reviewed the video surveillance tape, and saw "activity" near Gisela's car. Edgar contacted Officer Zeigler, and told him that he had video footage capturing a burglary. Officer Zeigler advised Edgar to have the tenants make a police report. Edgar made a copy of the video and delivered it to the police station.

Officer Zeigler testified that on February 27, 2013, he worked as a senior lead officer for the Los Angeles Police Department, and that part of his duties included acting as a community liaison. Officer Zeigler had previously supplied his cell phone number to Edgar E. Edgar contacted Officer Zeigler on February 27, 2013, to tell him about the burglary at the apartment building he managed. Officer Zeigler instructed Edgar to tell the victims to make a police report, and asked him to bring the video recording to the station. When Officer Zeigler initially reviewed the video on February 28, he immediately recognized the codefendant. When he reviewed the video again, he also recognized defendant. Officer Zeigler testified that he had spoken to the codefendant at least 12 to 15 times since 2011. The codefendant lived one block away from the burglary. Before his arrest, Officer Zeigler last encountered the codefendant on the afternoon of February 27, 2013, about two blocks away from the location of the burglary.

Officer Zeigler met defendant in 2005. He's had "countless" contacts with defendant; he would "see him a lot. I talk to him all the time . . . ."

The area where the burglary occurred is controlled by the Clanton or C-14 gang. Defendant admitted to Officer Zeigler that he was a gang member, with a moniker "Wicked." Defendant was a member of Clanton back in 2005 when Officer Zeigler first met him. Defendant told Officer Zeigler he was a "shot caller" for the gang. All of Officer Zeigler's contacts with defendant have occurred in territory controlled by the Clanton gang. On two or three occasions, Officer Zeigler saw both defendants together. He saw the defendants together on February 27, two blocks away from the burglary, after

10

the burglary was reported.  Officer Zeigler had not yet reviewed the video when he saw the two defendants together that day.

Officer Zeigler testified that codefendant's appearance had changed from the time of his arrest.  At the time of his arrest, he had shorter hair and a short beard.  He had also gained 30 pounds since his arrest.  Defendant's hair was also longer at trial; his head used to be completely shaved.  He had also gained approximately 40 pounds.

Officer Zeigler's partner, Officer Gutierrez, testified that he had numerous contacts with defendant.  Towards the end of February 2013, Officer Zeigler told him that defendant was a burglary suspect.  Officer Gutierrez shared this information with Officer Lopez.

Officer Lopez testified that he had been briefed about an open burglary investigation.  He had been instructed to locate defendant, who was a suspect for the crime.  During his patrol on March 3, 2013, Officer Lopez located defendant near the 500 block of North Kenmore.  Defendant's appearance at trial was different from his appearance on March 3.  On March 3, defendant had a shaved head and a visible tattoo on the side of his head that said "Clanton" in cursive.  At trial, defendant's hair was long.  Officer Lopez detained defendant and transported him back to the police station.  While at the police station, Officer Lopez reviewed the surveillance video capturing the burglary.  The shoes of one of the perpetrators of the burglary matched the shoes defendant was wearing at the time of his detention.  Officer Lopez's partner booked the shoes into evidence.  The shoes were shown to the jury.

Officer Victor Villanueva participated in defendant's arrest on March 3.  At the time of his arrest, defendant admitted to being a member of the Clanton gang.  He had been a member for approximately 15 years.

Officer Jason Abner had contact with defendant in May 2010.  His partner, Officer Vokey, completed a Field Interview card for defendant.  The card noted a gang-related "Clanton" tattoo on defendant's right forearm.

Officer Howarth was working as a gang officer in 2010.  He had prior contacts with defendant, and in July 2010, completed Field Interview cards for defendant.  At that

11

time, Officer Howarth's partner was Officer Breegle. On July 4, 2010, defendant admitted to being a member of the Clanton gang with a moniker of "Wicked." Defendant also admitted to being a member of the gang for 12 years. Officer Howarth observed a number of gang-related tattoos on defendant including a "C" on his left arm, "14" on his right arm, "Clanton" across his chest, "Clanton's Best" or "Finest" on the side of his head, "Clanton" on the back of his neck, and "DKS." On July 4, 2010, defendant was dressed in gang attire. Officer Howarth was also present when a Field Interview card was completed for defendant on July 26, 2010. Defendant again claimed membership in the Clanton gang, and was dressed in gang attire.

Officer Breegle testified that he met codefendant three or four times, since first meeting him in 2012. Officer Breegle had about 10 to 15 prior contacts with defendant. Officer Breegle reviewed the surveillance video, and recognized both defendants. The court admonished the jury that it was Officer Breegle's opinion that he "recognizes those individuals. He's under a slightly better position because he's met these individuals before, but ultimately it's for you to decide whether those are the individuals in the video or not. He's testifying as to what's called a lay person, and I will explain in instructions what that is." The prosecutor showed Officer Breegle five still photographs from the video, and Officer Breegle testified he recognized the individuals as the defendants.

Officer Breegle testified as a gang expert. He described the boundaries of the Clanton gang, as well as a clique of that gang called the Duke's clique. The gang had approximately 150 members, and had existed since the 1920's. Common tattoos for the gang included "C," "Clanton," and "14." The primary activities of the gang were vandalism, burglaries, narcotics sales, weapons possession, and robberies. He testified to a predicate offense of robbery. Officer Breegle opined that the perpetrator of the robbery was a member of the Clanton gang based on his tattoos and self-admission. Officer Breegle also testified to a predicate offense of possession of a firearm. He opined that the perpetrator of that crime was a Clanton gang member based on his tattoos and self-admission.

12

Officer Breegle opined that defendant was a Clanton gang member based on his tattoos, pictures of which were shown to the jury. Officer Breegle's opinion was also based on his prior contacts with defendant, in Clanton gang territory, where defendant admitted to being a member of the gang. Officer Breegle had also seen defendant wearing gang attire.

Officer Breegle opined that codefendant was a Clanton associate, as all of Officer Breegle's contacts with codefendant occurred in Clanton gang territory. Moreover, Officer Zeigler had seen codefendant and defendant together.

In answer to a hypothetical question based on the facts of the case, Officer Breegle opined that the burglary was committed at the direction of, in association with, and for the benefit of the Clanton gang. It was common for gang members to commit crimes with other gang members or associates. Both gang members and associates "put[] in work" to prove their worth to the gang. Gang associates will carry out tasks given to them by gang members. People who want to gain status in the gang are willing to commit crimes at the gang's behest, and to go on gang missions.

A "shot-caller" is a "street level president of that particular gang." They are responsible for giving orders. Defendant admitted to Officer Breegle that he was a shot-caller within the Clanton gang. A shot-caller would be the person in charge of any gang mission, and would ensure that the mission was carried out properly. A gang associate would do what the shot-caller directed them to do. When an associate does as directed, it benefits the gang.

Officer Breegle believed the crime was gang related because it was committed by multiple people, one of whom is an associate and the other is a shot-caller. Putting in work for the gang would elevate their gang status.

Moreover, the crime was committed in Clanton gang territory. A Clanton shot-caller would be aware of crimes being committed on gang turf.

Both defense attorneys extensively questioned Officer Breegle about his undocumented contacts with the defendants, and Officer Breegle was unable to identify the dates of the contacts.

Defendant recalled Officer Breegle to testify in the defense case. The Field Interview cards filled out for defendant in 2010 did not state that defendant was a shot-caller, but, according to Officer Breegle, comments on the cards that defendant told kids in the neighborhood to stop tagging supported such an inference.

**DISCUSSION**

**1.    Bifurcation**

Before trial, codefendant filed a motion to bifurcate trial on the gang enhancement on the ground it was "inherently prejudicial. . . ." Defendant joined in the motion. The trial court denied the motion, because the case involved two defendants, including a gang member and a gang associate. The trial court stated it rested its ruling on *People v. Hernandez* (2004) 33 Cal.4th 1040 (*Hernandez*).

At the conclusion of trial, both defendants moved under section 1118.1 to dismiss the gang allegations based on a failure of proof of the predicate offenses. One of the predicate offenses, possession of an assault weapon, was not an enumerated predicate offense under section 186.22, subdivision (e). The prosecutor asked for an opportunity to cure the problem by proving up another predicate offense, but the trial court granted defendants' motions as to the gang allegations.

The trial court instructed the jury that the "gang allegation is no longer going to be considered by you. As a result [the pictures of defendant's tattoos] are no longer relevant. You're not [to] consider them for any purpose whatsoever. The evidence of gang membership is no longer relevant. Not to be considered for any purpose whatsoever."

We review the denial of a motion to bifurcate the trial of a gang enhancement for abuse of discretion, based on the facts before the court at the time its ruling was made. (*Hernandez*, *supra*, 33 Cal.4th at p. 1048; see also *People v. Vega-Robles* (2015) 236 Cal.App.4th 554, 590.) *Hernandez* held the legal basis for bifurcation of a prior conviction allegation also permits bifurcation of a gang allegation. (*Hernandez*, at p. 1049.) However, "the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense. So less need for

14

bifurcation generally exists with the gang enhancement than with a prior conviction allegation." (*Id.* at p. 1048.)

*Hernandez* noted gang evidence may be relevant to "identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*Hernandez, supra*, 33 Cal.4th at p. 1049.) "To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Id.* at pp. 1049-1050.) However, "[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself -- for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged -- a court may still deny bifurcation." (*Id.* at p. 1050.)

"[A] trial court's discretion to deny bifurcation of a charged gang enhancement is . . . broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Hernandez, supra*, 33 Cal.4th at p. 1050.) Bifurcation is required only where a defendant can " 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.]" (*Id.* at p. 1051.)

Defendant argues that the gang evidence was collateral to the crime, as there was no evidence that a gang name was shouted out, or gang signs were flashed during the burglary. He contends "there was nothing on the videotape that suggested the offense was gang related." Defendant therefore reasons that the evidence was irrelevant and highly prejudicial, and that bifurcation was warranted.

We disagree. The evidence was relevant to explain why four people might work in concert to commit a simple auto burglary. Also, the evidence was not unduly prejudicial. The prosecutor offered to refrain from introducing evidence of violent predicate offenses, or predicate offenses committed by defendant. (Compare *People v. Albarran* (2007) 149 Cal.App.4th 214, 219, 227-228 [gang evidence was prejudicial when prosecutor admitted there was no evidence to prove the crimes were gang related other than defendant's status as a gang member] with *Hernandez, supra*, 33 Cal.4th at

15

pp. 1045, 1049-1050 [when gang evidence is relevant to motive, any inference of prejudice is necessarily dispelled].)

The trial court was well within its discretion to deny defendant's request for bifurcation. And, it is irrelevant to our analysis that the enhancement was ultimately dismissed, as the relevant time in considering the court's exercise of discretion is the time the motion was decided. (*People v. Vega-Robles*, *supra*, 236 Cal.App.4th at p. 590.) The jury was instructed to disregard the gang evidence, and we presume they followed this instruction. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

**2.      Discovery Violations and Failure to Give a Curative Instruction**

Defendant complains of a "pattern of late discovery." We find no prejudicial error.

**a.      Analysis**

"Section 1054.1 (the reciprocal-discovery statute) 'independently requires the prosecution to disclose to the defense . . . certain categories of evidence "in the possession of the prosecuting attorney or [known by] the prosecuting attorney . . . to be in the possession of the investigating agencies." ' . . . 'Absent good cause, such evidence must be disclosed at least 30 days before trial, or immediately if discovered or obtained within 30 days of trial. (§ 1054.7.)' . . . [¶] Upon a showing both that the defense complied with the informal discovery procedures provided by the statute, and that the prosecutor has not complied with section 1054.1, a trial court 'may make any order necessary to enforce the provisions' of the statute, 'including, but not limited to, immediate disclosure, . . . continuance of the matter, or any other lawful order' (§ 1054.5, subd. (b)). The court may also 'advise the jury of any failure or refusal to disclose and of any untimely disclosure.' (*Ibid*.)" (*People v. Verdugo* (2010) 50 Cal.4th 263, 279-280, citations omitted.) The normal remedy for noncompliance with a discovery order is a continuance. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1131.) A trial court's rulings on discovery matters are reviewed for an abuse of discretion (*People v. Ayala* (2000) 23 Cal.4th 225, 299), and are subject to the harmless-error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Verdugo*, at p. 280.)

16

### i. Photographs

The prosecutor represented to the court that she had just been assigned to the case, had just learned of the photographs of defendant's tattoos, and had immediately turned them over. There was no prejudice to defendant, because the trial court was free to order that defendant disrobe before the jury to display his tattoos. (*People v. Roberts* (1975) 51 Cal.App.3d 125, 140.) The existence of the tattoos on his own body was within defendant's knowledge, so he could not have been surprised by any "belated" disclosure of the photographs. (See *People v. Panah* (2005) 35 Cal.4th 395, 460 [no prejudice when discovery was already within the defendant's knowledge].) As to the still photographs extracted from the surveillance tape, defendant was in possession of the tape, and could not claim surprise based on photographs taken from that tape, which were clearly marked with a timestamp. Because the tape itself had been disclosed, the prosecution had complied with its obligation to provide "[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged." (§ 1054.1, subd. (c); see also *Panah*, at p. 460.)

As for defendant's booking photographs, they were never published to the jury or admitted into evidence, and played no part in the People's case against defendant.

### ii. Undocumented Contacts

A prosecutor is required to disclose all **"**[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial." (§ 1054.1, subd. (f).) Defendant was not provided witness statements that discussed the undocumented contacts Officers Breegle and Howarth had with defendant. That is because there were no such witness statements to disclose. Officers Breegle and Howarth were listed on Field Interview cards concerning defendant, and were identified as witnesses on the prosecution's witness list.

Moreover, at the preliminary hearing, Officer Landry testified that his opinion that defendant was a gang member was based on information obtained from other "officers that have spoken to [defendant] on a regular basis." The only reasonable inference, based on the several Field Interview cards produced in discovery, is that many of these contacts

17

were undocumented. Moreover, defendant was permitted to examine Officer Breegle outside of the presence of the jury about these contacts. We are not persuaded on this record that counsel was "prevented from investigating Howarth's and Breegle's undocumented contacts" with defendant.

### iii. Gang Expert

Defendant argues that he did not receive sufficient notice that Officer Breegle would be called as a gang expert. Defendant was on notice that a gang expert would be called, but not that the expert would be different from the one who testified at the preliminary hearing. The trial court offered defendant a trial continuance to afford counsel an opportunity to prepare for Officer Breegle's expert testimony, but defendant declined. (*People v. Barnett, supra*, 17 Cal.4th at p. 1131 [The normal remedy for noncompliance with a discovery order is a continuance].) The trial court asked defendant's counsel if she wanted to examine Officer Breegle at the section 402 hearing, and counsel declined to do so. Moreover, the trial court gave defendant great latitude to extensively cross-examine Officer Breegle about any inconsistencies in his opinion from that of Officer Landry. We are not persuaded defendant was prejudiced by the court having permitted Officer Breegle to testify as the gang expert at trial.

The trial court rejected defendant's request that the jury be instructed with CALCRIM No. 306 as to Officer Breegle's designation as a gang expert. CALCRIM No. 306 provides, in pertinent part: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the (People/defense) failed to disclose: *<describe evidence that was not disclosed>* [within the legal time period]. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

A trial court's refusal to instruct the jury on late discovery is subject to review for abuse of discretion. (See *People v. Lamb* (2006) 136 Cal.App.4th 575, 581.) We find no abuse here. As discussed *ante*, the court took numerous steps to ensure defendant had a

fair opportunity to prepare for the testimony and cross-examination of Officer Breegle. We agree with the trial court that there was no late discovery; the People disclosed they intended to call a gang expert, identified Officer Breegle as the gang expert and were not in possession of any discovery concerning his testimony that was not disclosed.

**3.     Lay Testimony of Officers Zeigler and Breegle**

Officers Zeigler and Breegle were permitted to state their opinions that defendants were depicted in the surveillance video of the burglary.  It is well settled that the identity of the perpetrator of an offense, whose image was caught on film or videotape, is a proper subject for lay opinion testimony.  (Evid. Code, § 800; *Ingle*, *supra*, 178 Cal.App.3d at p. 513; *Perry*, *supra*, 60 Cal.App.3d at pp. 614-615.)  Such lay opinion evidence is admissible if two prerequisites are met:  "(1)  that the witness testify from personal knowledge of the defendant's appearance at or before the time the photo was taken; and (2) that the testimony aid the trier of fact in determining the crucial identity issue." (*Mixon*, *supra*, 129 Cal.App.3d at p. 128; see also § 800.)  The testimony can aid the trier of fact if the photograph is unclear, the defendant's appearance has changed, "or where for any reason the surveillance photo is not conclusive on the identity issue."  (*Ingle*, at p. 513.)  "Admission of lay opinion testimony is within the discretion of the trial court and will not be disturbed 'unless a clear abuse of discretion appears.'  [Citation.]" (*Mixon*, at p. 127.)  Such evidence does not invade the province of the jury, as it is intended to *help* them reach their ultimate conclusion.  (*Id*. at p. 128.)

Additionally, *Mixon*, relying on lower federal court authority, held that when considering the admissibility of the lay opinion testimony of law enforcement officers, the court should weigh the probative value of the evidence against the prejudice that arises from the inference that the defendant is known to police.  (Evid. Code, § 352; *Mixon*, *supra*, 129 Cal.App.3d at pp. 129, 134-135.)

**a.     Forfeiture**

Respondent argues that defendant has forfeited any claim of error as to Officer Zeigler's opinion.  It is true that defendant conceded the foundational requirements were satisfied as to Officer Zeigler, however, it is also true that defendant objected to the

19

testimony as "ultimate opinion" testimony. Our discussion below applies equally to the testimony of Officers Breegle and Ziegler, so no purpose is served in applying the forfeiture doctrine here.

### b. No abuse of discretion

The two prerequisites for admission of lay opinion testimony were met with respect to Officers Zeigler and Breegle. Both had numerous contacts with defendant, and were very familiar with his appearance at the time the video was recorded. Moreover, defendant's appearance had changed dramatically from the time the video was recorded. He had long hair that concealed many of the tattoos on his head, and he had gained 40 pounds. The officers' opinions, therefore, aided the jury in deciding whether defendant committed the burglary.

Defendant argues that the trial court failed to conduct the necessary Evidence Code section 352 analysis, urging that the court erroneously believed it had no discretion to exclude the testimony under section 352. While the court initially remarked that it was not bound by the federal authority cited by *Mixon*, the court subsequently entertained defendant's section 352 objections regarding Officer Breegle's testimony (no such objection was made as to Zeigler), and therefore clearly understood the scope of its discretion. We therefore disagree with defendant's characterization of the record.

Moreover, the prejudice associated with the fact that it was law enforcement officers offering their lay opinion did not outweigh the probative value of their testimony. This was a gang case, where the officers were already testifying to their contacts with defendant to establish his gang membership. Accordingly, this is not a case where any additional adverse inference was going to be drawn against defendant on the basis of defendant's contacts with police. (See *Mixon*, *supra*, 129 Cal.App.3d at pp. 129, 134-135.)

Moreover, defendant could not possibly have been prejudiced. (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 83-84 [applying *Watson* harmless error analysis to erroneous admission of lay opinion evidence].) The jury was properly instructed that it was their obligation to determine who was depicted in the video, and that they did not

20

need to accept the officers' opinions as true or correct. Additionally, the officers also identified the codefendant in the video, yet he was acquitted. Clearly, the jury relied on their own review of the video, rather than allowing the opinion testimony to usurp their duties.

**4.      Failure to Instruct Jury that Officer Testimony Was Circumstantial Evidence**

During their deliberations, the jury asked "When the officers testify upon viewing the video that the two men shown are [codefendant and defendant], is this considered directed [*sic*] or circumstantial evidence." Out of the presence of the jury, the court stated "[W]hat I have suggested and counsel have agreed is that I will instruct this jury that the videotape[ ] itself is direct evidence of the incident. The officers are expressing their lay opinion about who is depicted in that videotape, and they should refer to the instruction on lay opinion testimony." Defense counsel assented to this approach. The court then told the jury that the video was direct evidence, and that the officers' opinion about who was depicted in the video was lay opinion, which was addressed in CALCRIM No. 333.

Initially, we note that defendant has forfeited any claim of error, as he agreed to action taken by the trial court. (See *People v. Rogers* (2009) 46 Cal.4th 1136, 1162, fn. 14.) And, in any event, the claim fails on its merits. Under section 1138, "[t]he court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

Defendant claims the jury should have been directed to CALCRIM No. 224 (concerning the evaluation of circumstantial evidence),[4] rather than CALCRIM No. 333

---

**4**      CALCRIM No. 224 provides: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be

21

(concerning lay opinion evidence), both of which had already been provided to the jury. The jury had received extensive instructions defining circumstantial and direct evidence. The instructions given to the jury were full and complete. The trial court correctly informed the jury that the video was direct evidence, and that the officers' testimony was lay opinion testimony, which must be considered under CALCRIM No. 333. Although the court did not characterize the opinion testimony as circumstantial evidence (see *People v. Gentry* (1968) 257 Cal.App.2d 607, 611 [opinion evidence is circumstantial]), we can discern no possible prejudice. Like CALCRIM No. 224, CALCRIM No. 333 instructed the jury that "You must decide whether information on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence." The jury clearly understood that it was free to disregard the officers' opinions.

## DISPOSITION

The judgment is affirmed.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


FLIER, J.

---

convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."